FILED

NOV 18 2026

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY MM DEP CLK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

BENJAMIN WAYNE LATHAM,

Plaintiff,

v.

3M COMPANY;
AMEREX CORPORATION;
ARKEMA INC.;
BASF CORPORATION;
CHEMGUARD, INC.;
CORTEVA, INC.;
DUPONT DE NEMOURS, INC.;
DYNAX CORPORATION;
EIDP, INC. (f/k/a E.I. DU PONT DE NEMOURS AND COMPANY);
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
TYCO FIRE PRODUCTS LP,

Defendants.

Civil Action No. 5:26-CV-00291-BO

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiff, BENJAMIN WAYNE LATHAM, appearing pro se, brings this civil personal injury tort and products liability action against the above-named Defendants and alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action for compensatory and punitive damages arising out of Plaintiff's direct, hands-on occupational exposure to toxic Aqueous Film-Forming Foam ("AFFF") discharged from and maintained inside mobile spray fire extinguishers, vehicle foam dispensers, and flight-line suppression systems, as well as his continuous environmental exposure to AFFF-contaminated drinking water, groundwater, and soil during active-duty service in the United States Marine Corps ("USMC"). Plaintiff was exposed to Defendants' AFFF products both on land at military installations in North Carolina and aboard United States Navy vessels.

2. AFFF products designed, manufactured, formulated, marketed, and distributed by Defendants contain persistent, bioaccumulative, and toxic per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), and their fluorochemical precursors. None of Defendants' AFFF products, mobile foam extinguishers, concentrate containers, or recharge units bore any label or warning advising Plaintiff of their toxic chemical hazards, immunotoxicity, or capacity to cause chronic inflammatory bowel disease and systemic organ damage.

3. Plaintiff served on continuous active duty in the U.S. Marine Corps from June 28, 2010 through January 30, 2015 (Corporal / E-4, Primary Specialty MOS 0313 Light Armored Vehicle Crewman / MOS 0311 Rifleman), including continuous duty assignments at Marine Corps Base ("MCB") Camp Lejeune and Marine Corps Air Station ("MCAS") New River in Onslow County, North Carolina. Plaintiff's toxic chemical exposure occurred through two direct, compounding exposure mechanisms:

(a) **Direct Occupational and Operational Exposure:** Hands-on inspection, pressure checks, mechanical maintenance, refilling, field deployment, and cleanup of AFFF discharged from mobile spray firefighting extinguishers (both handheld and vehicle dispensers); leaking valves, seals, and hoses aboard assigned LAV-25 armored vehicles, HMMWVs (Humvees), Logistics Vehicle System Replacement ("LVSR") trucks, and 7-ton troop transport trucks; motor pool foam cleanups; working parties discharging old foam containers for DRMO disposal; emergency firefighting discharge during actual fire response involving an LAV-25; Naval ship well-deck washdowns and Landing Craft Air Cushion ("LCAC") following operations, and AFFF drills while deployed

aboard the amphibious assault ships USS Kearsarge (LHD-3) and USS Iwo Jima (LHD-7) where white AFFF foam covered the ship where I walked and residue remained on boots and uniform; and tactical military drills and training conducted directly in AFFF-contaminated soil, mud, surface water, and streams of bases; and

(b) **Environmental and Base Tap Water Exposure:** Daily ingestion, consumption of food cooked in, showering, bathing, oral hygiene, and laundering with tap water drawn from base distribution systems, specifically including the Hadnot Point Water Treatment System serving Plaintiff's barracks on L Street (Hadnot Point HP503/HP505), use of French Creek and main base dining facilities, Courthouse Bay dining facility, Stone Bay shooting range barracks and dining facility, and MCAS New River dining facilities, all of which had underlying soil and groundwater containing massive AFFF-derived PFAS plumes reaching concentrations as high as 172,748 parts per trillion ("ppt") for PFOS and 25,000 ppt for PFOA during Plaintiff's military service in eastern North Carolina from February 2011 to January 2015.

4. Unbeknownst to Plaintiff, during 2013–2015, base tap water testing conducted under the Environmental Protection Agency's ("EPA") Unregulated Contaminant Monitoring Rule 3 ("UCMR 3") utilized elevated Minimum Reporting Levels ("MRLs") of 20 ppt for PFOA and 40 ppt for PFOS. These high reporting thresholds masked chronic low-level PFAS contamination in base drinking water at levels far above the EPA's current health-based Maximum Contaminant Level ("MCL") of 4.0 ppt for PFOA and PFOS, leaving Plaintiff exposed without notice or protective intervention.

5. In addition to base exposures at MCB Camp Lejeune and MCAS New River, Plaintiff experienced substantial regional environmental exposures across eastern North Carolina, consuming tap water during duty and travel to Fort Bragg (including an extended patient stays at Womack Army Medical Center in December 2013), during a visit to Seymour Johnson Air Force Base in Goldsboro, in Fayetteville in Cumberland County for a fellow service member's wedding, and in visits and stays to the cities of Wilmington, Southport, and lower Cape Fear communities in and around New Hanover County and Brunswick County (where public drinking water was drawn directly from the PFAS-contaminated Cape Fear River) North Carolina. Contraction and exposure is also made by wading and swimming in on base swimming pools aboard Camp Lejeune, and contaminated streams, rivers, and lakes throughout the Cape Fear River basin during his military service in eastern North Carolina from 2011 to 2015.

6. As a direct and proximate result of Plaintiff's exposure to Defendants' defective PFAS products, Plaintiff contracted ulcerative colitis (ICD-10 Code K51), a severe, chronic, incurable autoimmune and inflammatory bowel disease marked by recurrent flare-ups. Plaintiff suffers from ulcerations of the colon, bloody diarrhea with periods of severe diarrhea alternating with constipation, severe abdominal cramping and pain, bloating, heartburn, intermittent nausea and vomiting, a constant urgent need to use the restroom, fever, sweats, fatigue, rectal and anal stinging, hemorrhoids, anal leakage, and malabsorption. Plaintiff has also suffered non-cancerous liver injury, including elevated liver enzymes that more than doubled between January and July 2023; Rheumatoid Arthritis with migratory joint pain; and Asthma and allergic rhinitis. To control his flare-ups, Plaintiff has been prescribed corticosteroids, including prednisone tapers, and mesalamine (mesalazine), including Lialda.

7. Plaintiff began experiencing symptoms and noticeable changes in his health, including pain, physical difficulties, and limitations, approximately three to four months after his first exposure to AFFF and contaminated water with continued worsening and received an initial clinical evaluation for gastrointestinal symptoms in May 2014 while on active duty. Plaintiff was diagnosed with inflammatory bowel disease in June 2015 observing the onset of his symptoms from in-service and received upper and lower endoscopies, with further diagnostic testing, including pill-cam, gastric emptying tests, and mucosal tissue biopsies, in 2015 and 2016. A VA Compensation and Pension examination on June 30, 2016 documented his diagnosis of inflammatory bowel disease under ICD-10 code K51 (ulcerative colitis), along with irritable bowel syndrome (ICD-10 K58.0), both diagnosed in 2015. The Department of Veterans Affairs ("VA") granted service connection for Plaintiff's gastrointestinal disease, awarding the 30% schedular maximum legal disability rating for K51 inflammatory bowel disease / irritable bowel syndrome.

8. Plaintiff notes existence of active consolidated federal multidistrict litigation governing AFFF products liability claims, styled In re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG, pending in U.S. District Court for the District of South Carolina (Charleston Division). Plaintiff files this action in the U.S. District Court for the Eastern District of North Carolina (Western Division) as proper forum of primary jurisdiction and home venue. Should this Court or the Judicial Panel on Multidistrict Litigation ("JPML") transfer this action to MDL No. 2873 for coordinated pretrial proceedings under 28 U.S.C. § 1407, Plaintiff consents to transfer while reserving rights to remand to Eastern District of North Carolina for trial.

9. Plaintiff adopts and incorporates by reference the common factual, scientific, and liability allegations set forth in the Plaintiffs' Master Long-Form Complaint on file in MDL No. 2873 to the extent consistent herewith. Plaintiff names Defendants 3M Company, Amerex

Corporation, Arkema Inc., BASF Corporation, Chemguard, Inc., Corteva, Inc., DuPont de Nemours, Inc., Dynax Corporation, EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company), The Chemours Company, The Chemours Company FC, LLC, and Tyco Fire Products LP as corporate manufacturers, formulators, and chemical suppliers of Qualified Products List ("QPL") AFFF concentrates, mobile foam extinguishers, and PFAS fluorosurfactants.

## II. JURISDICTION AND VENUE

***Subject Matter Jurisdiction***

10. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Plaintiff (a citizen and resident of the State of North Carolina) and all named Defendants (citizens of Minnesota, Alabama, Pennsylvania, Delaware, New Jersey, Wisconsin, Indiana, and New York), and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11. This Court also has original admiralty and maritime jurisdiction under 28 U.S.C. § 1333(1) over Plaintiff's claims arising from his AFFF exposure aboard USS Kearsarge (LHD-3) and USS Iwo Jima (LHD-7) while those vessels were operating on navigable waters, because those injuries occurred on navigable waters and arose from activity bearing a substantial relationship to traditional maritime activity, namely operation, fire protection, and firefighting systems of vessels at sea. Because claims are within this Court's diversity jurisdiction, Plaintiff does not designate as admiralty or maritime claims under FRCP 9(h). Plaintiff demands jury trial on all claims.

***Venue in the Eastern District of North Carolina***

12. Venue is proper in the United States District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims (including Plaintiff's handling, maintenance, and discharge of AFFF mobile extinguishers, vehicle leaking foam exposure, motor pool cleanups,

field maneuvers, and daily consumption of contaminated tap water) occurred within this judicial district at MCB Camp Lejeune and MCAS New River in Onslow County, Fort Bragg and Womack Army Medical Center in Cumberland County, Seymour Johnson Air Force Base in Wayne County, Wilmington in New Hanover County, and Southport in Brunswick County, North Carolina.

13. Venue is further proper under 28 U.S.C. § 1391(b)(1) because all Defendants are subject to personal jurisdiction within the State of North Carolina for claims arising out of their commercial distribution of AFFF and PFAS materials into North Carolina.

14. To the extent this Court or the JPML orders transfer to MDL No. 2:18-mn-2873-RMG (D.S.C.), Plaintiff consents to pretrial transfer while designating the Eastern District of North Carolina as the home transferor venue for trial upon completion of MDL pretrial proceedings.

***Personal Jurisdiction***

15. Each Defendant purposefully availed itself of the privilege of conducting business in North Carolina by designing, manufacturing, marketing, selling, and distributing MIL-F-24385 QPL AFFF, AFFF mobile foam extinguishers, and PFAS fluorosurfactant components to the U.S. Department of Defense ("DoD") with the specific knowledge and intention that those products would be shipped to, stored at, discharged on, and introduced into the soil and water supply of military installations in North Carolina, including MCB Camp Lejeune and MCAS New River.

## III. PARTIES

***Plaintiff***

16. Plaintiff BENJAMIN WAYNE LATHAM is a citizen and resident of the State of North Carolina, residing at 6408 Truxton Lane, Raleigh, Wake County, NC 27616. An honorably discharged veteran of the United States Marine Corps, served on active duty from June 28, 2010 through January 30, 2015, served in North Carolina from February 2011 through January 2015.

***Defendants***

17. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) is a corporation organized under the laws of Delaware with its principal place of business in St. Paul, Minnesota (citizen of Delaware and Minnesota). At all relevant times, 3M designed, manufactured, marketed, and sold MIL-F-24385 QPL AFFF concentrates (Light Water) containing PFOS and PFOA to the U.S. military, stocks of which remained in military inventory, groundwater plumes, and mobile extinguishers at MCB Camp Lejeune and MCAS New River during Plaintiff's service.

18. Defendant Amerex Corporation is a corporation organized under the laws of Alabama with its principal place of business in Trussville, Alabama (citizen of Alabama). At all relevant times, Amerex designed, manufactured, marketed, and sold portable foam firefighting extinguishers utilizing Mil-Spec AFFF to the U.S. military.

19. Defendant Arkema Inc. is a corporation organized under laws of Pennsylvania with its principal place of business in King of Prussia, Pennsylvania (citizen of Pennsylvania). At all relevant times, Arkema (as successor to Atochem and Atofina) designed, manufactured, marketed, and supplied PFAS fluorotelomer surfactants incorporated into Mil-Spec AFFF products.

20. Defendant BASF Corporation is organized under laws of Delaware with principal place of business in Florham Park, New Jersey (citizen of Delaware and New Jersey). At all relevant times, BASF (including its predecessor Ciba Specialty Chemicals) designed, manufactured, and supplied PFAS fluorosurfactants used in Mil-Spec AFFF formulations.

21. Defendant Chemguard, Inc. is a corporation organized under the laws of Wisconsin with its principal place of business in Marinette, Wisconsin (citizen of Wisconsin). At all relevant times, Chemguard designed, manufactured, marketed, and sold MIL-F-24385 QPL AFFF concentrates and fluorosurfactants used in military mobile firefighting equipment.

22. Defendant Corteva, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Indianapolis, Indiana (citizen of Delaware and Indiana), and is a successor/spinoff entity holding historical DuPont AFFF and fluorochemical liabilities.

23. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware (citizen of Delaware), and is a successor/spinoff entity holding historical DuPont AFFF and fluorochemical liabilities.

24. Defendant Dynax Corporation is a corporation organized under the laws of Delaware with its principal place of business in Pound Ridge, New York (citizen of Delaware and New York). At all relevant times, Dynax was a primary supplier of PFAS fluorosurfactants to non-3M manufacturers of MIL-F-24385 QPL AFFF sold to the U.S. military.

25. Defendant EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company) is a corporation organized under laws of Delaware with its principal place of business in Wilmington, Delaware (citizen of Delaware). At all relevant times, EIDP designed, manufactured, and supplied PFOA, PFOS, and fluorotelomer surfactants incorporated into Mil-Spec AFFF products.

26. Defendant The Chemours Company is a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware (citizen of Delaware), and assumed historical DuPont fluorochemical liabilities.

27. Defendant The Chemours Company FC, LLC is a Delaware limited liability company whose sole member is Defendant The Chemours Company, making it a citizen of Delaware, and assumed historical DuPont fluorochemical liabilities.

28. Defendant Tyco Fire Products LP is a Delaware limited partnership headquartered in Marinette, Wisconsin, whose general and limited partners are corporate citizens of Delaware

and Wisconsin. At all relevant times, Tyco (including its Ansul brand) designed, manufactured, marketed, and sold MIL-F-24385 QPL AFFF concentrates and mobile foam firefighting systems used at U.S. military installations.

***Commingled and Fungible Mil-Spec Products***

29. All Mil-Spec AFFF concentrates supplied under MIL-F-24385 were manufactured to uniform military specifications, were fully interchangeable, and were stored and refilled in shared bulk military storage facilities across base units. These products were used interchangeably to charge and recharge mobile foam extinguishers, vehicle dispensers, crash trucks, and fire suppression systems. Plaintiff could not identify which Defendant's batch filled any specific extinguisher he handled. The resulting groundwater and soil contamination at MCB Camp Lejeune and MCAS New River likewise represents an indivisible mixture of PFAS chemicals from all Defendants' products. Consequently, Defendants are jointly and severally liable for Plaintiff's cumulative chemical exposure and resulting injuries and conditions.

## IV. FACTUAL ALLEGATIONS

***Direct Occupational and Vehicle AFFF Extinguisher Exposure***

30. During Plaintiff's continuous active-duty service from 2010 to 2015 as an LAV Crewman and Infantry Rifleman, Plaintiff was assigned to operational units stationed at MCB Camp Lejeune and MCAS New River.

31. AFFF mobile spray extinguishers were carried inside Plaintiff's assigned LAV-25 armored vehicle, where they repeatedly seeped and leaked AFFF solution from valves, seals, and hoses into the crew compartment, coating the interior, floorboards, seats, Plaintiff's uniform, skin, and tactical gear. Plaintiff was also exposed to mobile extinguishers aboard older HMMWVs (Humvees), LVSR trucks, and 7-ton troop transport trucks.

32. In the course of Plaintiff's military duties, Plaintiff performed hands-on inspection, pressure checks, mechanical maintenance, refilling, and cleaning of handheld and vehicle-mounted AFFF extinguishers, and would go up top on the Navy Vessels flight-line where AFFF extinguishers aboard those vessels were discharged for training and actual fire with flurries of white foam littering the decks and got onto clothing and boots and residue remained after performing in working parties and ship resupplies during his shipborne deployments with the 24th and 26th MEU on the U.S.S. Kearsarge and U.S.S. Iwo Jima. Many extinguishers during his service were also actively leaking, causing AFFF concentrate to contact Plaintiff's bare skin and hands, which inadvertently transferred to his mouth, food, and water during routine military operations.

33. Plaintiff also participated in motor pool maintenance and working parties where he cleaned up discharged AFFF foam and chemical residue twice, and carried old, expired AFFF extinguishers and concentrate containers to Defense Reutilization and Marketing Office ("DRMO") holding areas, during which Plaintiff and fellow Marines discharged residual foam into open air and ground pits as ordered and as not fitted and had no reason to know to wear protective suit, mask, or handle with any precaution to keep away foam from his skin, mouth and eyes.

34. Plaintiff engaged in tactical military training drills, field maneuvers, and vehicle maintenance directly in mud, soil, surface water, and streams heavily saturated with discharged AFFF foam runoff across base training sectors, including the swampy wetlands of the base.

***Shipboard AFFF Exposure Aboard USS Kearsarge (LHD-3) and USS Iwo Jima (LHD-7)***

35. During his service, Plaintiff deployed with his unit aboard the amphibious assault ships USS Kearsarge (LHD-3) and USS Iwo Jima (LHD-7), as part of the 26th and 24th Marine Expeditionary Units, from February 2011 to May 2011 and from March 2012 to December 2012. Plaintiff's LAV-25 and other tactical vehicles embarked aboard these ships, stowed in their well decks and vehicle stowage areas, and transported on Landing Craft Air Cushion ("LCAC") vessels.

36. Throughout these deployments, USS Kearsarge and USS Iwo Jima were operating on navigable international waters, and Plaintiff's shipboard exposures described below occurred aboard those vessels while they were either underway or in navigable waters.

37. Wasp-class amphibious assault ships such as USS Kearsarge and USS Iwo Jima are equipped with AFFF fire suppression systems to protect the fuel-laden aircraft, landing craft, and combat vehicles they carry, including AFFF sprinkler, washdown, and hose systems serving the well deck and vehicle stowage areas. During the period of Plaintiff's deployments, AFFF was the standard fire suppression agent aboard the U.S. Navy ships on which Plaintiff was aboard.

38. While embarked, Plaintiff worked in and around the semi-enclosed well deck during LCAC operations, vehicle loading and unloading, and well-deck washdowns, and was present for AFFF system drills and discharges. During these activities, AFFF foam, spray, and aerosolized mist came into direct contact with Plaintiff's eyes, mouth, skin, face, uniform, boots, and gear, he breathed AFFF mist in the confined, poorly ventilated well-deck environment. AFFF residue remained on the well-deck surfaces and on the vehicles Plaintiff crewed and maintained.

39. Plaintiff also responded to an actual fire involving an LAV-25 in August 2013, during which AFFF was discharged to suppress the fire. Plaintiff was directly exposed to high-concentration AFFF foam, spray, and runoff that saturated his skin, uniform, boots, and gear, and he was further exposed during the cleanup and washdown that followed on the vehicle ramp.

40. No AFFF system, container, or station aboard either ship bore any label or warning advising Plaintiff that AFFF contained toxic PFAS, and Plaintiff was given no chemical-resistant protective equipment or decontamination instructions for AFFF exposure.

***Base Drinking Water and Groundwater Contamination Plumes***

41. Unbeknownst to Plaintiff during his service, decades of uncontained AFFF discharge at MCB Camp Lejeune and MCAS New River created massive sub-surface PFAS

plumes in underlying groundwater and soil. DoD environmental testing revealed extreme contamination levels, including groundwater concentrations up to 172,748 ppt for PFOS and 25,000 ppt for PFOA during Plaintiff's service window.

42. Plaintiff drank, cooked with, showered in, bathed in, and brushed his teeth with tap water every day of his service while residing in military barracks located on L Street in the Hadnot Point area (Hadnot Point HP503/HP505 barracks), which received potable water supplied by the Hadnot Point Water Treatment System, as well as across base distribution networks at French Creek, Courthouse Bay, Stone Bay, and MCAS New River.

43. During 2013–2015, tap water testing under the EPA's UCMR 3 utilized Minimum Reporting Levels of 20 ppt for PFOA and 40 ppt for PFOS. These elevated reporting thresholds masked chronic PFAS contamination in base drinking water at levels far above the EPA's current health-based Maximum Contaminant Level of 4.0 ppt for PFOA and PFOS, leaving Plaintiff exposed without notice or protective intervention.

***Off-Post Regional Exposures Across Eastern North Carolina***

44. In addition to base exposures at Camp Lejeune and MCAS New River, Plaintiff experienced substantial regional exposures across eastern North Carolina:

(a) **Fort Bragg and Womack Army Medical Center:** Plaintiff visited Fort Bragg and stayed at Womack Army Medical Center as an inpatient and outpatient, consuming tap water contaminated by decades of AFFF use at Fort Bragg;

(b) **Seymour Johnson Air Force Base:** Plaintiff visited Seymour Johnson AFB in Goldsboro, North Carolina, drinking water contaminated by AFFF;

(c) **Wilmington and Lower Cape Fear Communities:** Plaintiff frequently traveled to Wilmington and neighboring coastal communities, drinking municipal water drawn directly from the Cape Fear River; and

(d) **Cape Fear River Basin Waterways:** Plaintiff regularly swam, waded, and conducted water maneuvers in swimming pools, streams, rivers, and lakes throughout the Cape Fear River basin in eastern North Carolina in connection with his military service and training.

***Absence of Warnings or Protective Equipment***

45. At no time during Plaintiff's military service did any Defendant warn Plaintiff or military authorities that AFFF contains bioaccumulative immunotoxins capable of causing inflammatory bowel disease and ulcerative colitis, liver injury, and other immune-mediated disease. Defendants provided no safety data sheets, container labels, or chemical-impervious protective equipment to guard against dermal absorption or oral ingestion of AFFF mists, runoff, and tap water contaminants.

***Clinical Diagnosis of Ulcerative Colitis and VA Disability Rating***

46. Plaintiff began experiencing symptoms and noticeable changes in his health approximately three to four months after his first exposure to AFFF and contaminated water. Plaintiff suffered worsening bloody stools, severe abdominal cramping, chronic diarrhea, rectal stinging, anal leakage, and malabsorption with continued worsening.

47. In June 2015, following upper and lower endoscopies, Plaintiff was diagnosed with ICD-10 K51 (ulcerative colitis ) inflammatory bowel disease. Further diagnostic evaluations in 2015 and 2016, including mucosal tissue biopsies, followed.

48. On June 30, 2016, a VA physician performed an in-person Compensation and Pension examination of Plaintiff, reviewed his VA records, and completed an Intestinal Conditions Disability Benefits Questionnaire. The examining physician documented that Plaintiff had been diagnosed in 2015 with inflammatory bowel disease, coded under ICD-10 K51 (ulcerative colitis)

and Plaintiff was formally diagnosed with that (Ulcerative Colitis) inflammatory bowel disease after undergoing upper and lower endoscopies in June 2015.

49. The examining physician further documented that Plaintiff suffered from abdominal cramps, bloating, alternating diarrhea and constipation (with diarrhea typically lasting about two days, alternating with constipation lasting about three days), and intermittent nausea and vomiting; that Plaintiff had experienced seven or more exacerbations or attacks of his intestinal condition in the preceding twelve months; and that Plaintiff's chronic gastrointestinal symptoms moderately affected his work activities and concentration.

***Symptoms, Flare-Ups, and Medical Treatment***

50. Plaintiff's ulcerative colitis follows a chronic, relapsing course, with recurrent flare-ups superimposed on ongoing daily symptoms. During flare-ups, and on an ongoing basis between them, Plaintiff suffers from:

(a) Bloody diarrhea, including periods of severe, uncontrollable diarrhea;

(b) Alternating periods of constipation;

(c) Ulcerations of the inflamed lining of the colon and rectum;

(d) Severe abdominal cramping and pain;

(e) Bloating and abdominal distension;

(f) Heartburn;

(g) A constant, urgent feeling of the need to use the restroom (bowel urgency and tenesmus);

(h) Fever and sweats;

(i) Intermittent nausea and vomiting;

(j) Fatigue;

(k) Rectal and anal stinging and burning, hemorrhoids, and anal leakage; and

(l) Malabsorption associated with celiac sprue.

51. To bring his flare-ups under control and to treat his bloating, cramping, bloody diarrhea, ulcerations, and pain, Plaintiff's physicians have prescribed corticosteroid therapy, including tapering courses of prednisone, and anti-inflammatory therapy with mesalamine (also known as mesalazine), including Lialda (mesalamine delayed-release tablets).

52. Because ulcerative colitis is incurable, Plaintiff will require prescription medication, medical monitoring, and treatment of recurrent flare-ups for the rest of his life. Repeated courses of corticosteroids such as prednisone carry well-recognized risks of serious side effects, adding to the burden and cost of Plaintiff's ongoing care. Plaintiff's symptoms cause him continuing physical pain, embarrassment, and disruption of his daily life, and impair his ability to work and concentrate, as documented by the Dept. of Veteran Affairs.

***Non-Cancerous Liver Injury and Elevated Liver Enzymes***

53. Plaintiff has also developed elevated liver enzymes. VA blood testing on January 5, 2023 showed an alanine aminotransferase ("ALT") level of 70 and an aspartate aminotransferase ("AST") level of 47, both flagged as abnormally high. Repeat VA testing on July 24, 2023 showed that Plaintiff's liver enzymes had roughly doubled, to an ALT of 145 and an AST of 93, again flagged as abnormally high.

54. Plaintiff's VA physician reported the results as abnormal liver numbers and entered a gastroenterology consult for further evaluation. Plaintiff's VA providers documented that he does not drink alcohol.

55. PFOA and PFOS accumulate in the human liver. A 2022 systematic review and meta-analysis of human and animal studies found that exposure to PFOA and PFOS is associated with higher ALT levels in humans, that PFOA exposure is also associated with higher AST levels, and that the evidence supports a likely relationship between PFOA and PFOS exposure and liver

injury. Animal studies included in that review showed that PFOA and PFOS exposure causes liver injury, including fatty changes in liver cells (steatosis). The EPA and the federal Agency for Toxic Substances and Disease Registry have each relied on liver effects in setting human health criteria for these chemicals.

56. Plaintiff's exposure to Defendants' PFAS caused or substantially contributed to his elevated liver enzymes, and places him at continuing risk of further liver injury requiring ongoing medical monitoring.

57. The VA Board of Veterans' Appeals and Regional Office granted service connection for Plaintiff's gastrointestinal disease, awarding a 30% schedular disability rating for his ICD-10 K51 (ulcerative colitis) inflammatory bowel disease.

***Rheumatoid Arthritis and Joint Pain***

58. Plaintiff suffers from migratory joint pain and from pain and tenderness of his muscles and joints, and has been diagnosed with Rheumatoid Arthritis. Plaintiff has been evaluated and treated by rheumatology and immunology specialists, and has been prescribed medications including sulfasalazine and adalimumab (Humira) and several others to treat this condition.

59. PFAS have immunosuppressive and immune-disrupting properties. A 2025 study of 8,743 U.S. adults from the National Health and Nutrition Examination Survey (2005–2018), published in the International Journal of Molecular Sciences, found that elevated PFOA (odds ratio 1.63), PFOS (odds ratio 1.41), and PFNA (odds ratio 1.40) levels were each associated with significantly increased risk of rheumatoid arthritis, and that combined PFAS mixtures increased that risk, with PFOA as the primary contributor. Lv et al., Int. J. Mol. Sci. 26 (2025) 7518. A 2026 Mendelian randomization analysis of FinnGen and UK Biobank genetic data likewise found that higher genetically predicted PFOA levels were significantly associated with higher rheumatoid arthritis risk.

60. Plaintiff's exposure to Defendants' PFAS caused or substantially contributed to his rheumatoid arthritis and joint pain.

***Asthma and Airway Inflammation***

61. Plaintiff has been diagnosed with trouble breathing, Asthma, and rhinitis.

62. PFAS exposure from firefighting foam has been associated with asthma in highly exposed populations. A 2026 register-based cohort study of more than 11,000 children in Blekinge, Sweden, where the drinking water in Ronneby had been contaminated by firefighting foam used in fire drills, found that children of mothers with very high PFAS exposure had approximately 40 percent higher risk of developing asthma than children with low exposure. Blomberg et al., PLOS Medicine (2026), doi:10.1371/journal.pmed.1004659.

63. Plaintiff's exposure to Defendants' PFAS caused or substantially contributed to his asthma, breathing troubles, and rhinitis.

***Treatment, Specialist Care, and Functional Limitations***

64. Plaintiff has been evaluated and treated by specialists in immunology, rheumatology, gastroenterology, neurology, sleep medicine, dermatology, physical medicine and rehabilitation, physical therapy, otolaryngology, and endocrinology.

65. Plaintiff's treatment has included sulfasalazine, adalimumab (Humira), mesalamine (Lialda), prednisone, dexlansoprazole, gabapentin, amitriptyline, naproxen, and over-the-counter loperamide (Imodium). Despite this treatment, Plaintiff's conditions have not resolved, and his care has been limited to managing his symptoms and monitoring his condition.

66. Plaintiff currently suffers from tiredness, fatigue, and exhaustion; pain and tenderness of his muscles and joints; and episodes of feeling faint severe enough to require bed rest for several days at a time each month. Plaintiff has difficulty standing or sitting upright for long periods. These limitations substantially interfere with daily activities and his ability to work.

*Medical Causation*

67. Plaintiff's multi-pathway exposure to Defendants' toxic PFAS chemicals (PFOA, PFOS, and precursors) via leaking AFFF mobile extinguishers inside the LAV-25, maintenance of leaking extinguishers, well-deck washdowns post LCAC operations, and AFFF drills aboard USS Kearsarge and USS Iwo Jima, the LAV-25 fire response, motor pool cleanups, DRMO working parties, field drills in contaminated soil, daily consumption of contaminated base tap water, off-post water consumption in Eastern NC, and swimming in Cape Fear River waterways is direct, proximate, and substantial factors in causing his ulcerative colitis and gastrointestinal conditions, and caused or substantially contributed to his non-cancerous liver injury /elevated liver enzymes, rheumatoid arthritis / joint pain, and asthma / rhinitis.

## V. TIMELINESS, SCRA TOLLING, AND DELAYED DISCOVERY

***SCRA Active-Duty Tolling (50 U.S.C. § 3936(a))***

68. Plaintiff served on continuous active duty in the U.S. Marine Corps from June 28, 2010 through January 30, 2015. Pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. § 3936(a), the entire period of Plaintiff's active military service is excluded as a matter of federal law from the computation of any state or federal statute of limitations or statute of repose.

***Delayed Discovery Rule and Accrual (N.C. Gen. Stat. § 1-52(16))***

69. Although Plaintiff was diagnosed with ulcerative colitis in 2015, Plaintiff understood his condition to be a disease of unknown origin until recently. No physician, VA examiner, or military authority ever informed Plaintiff that his ulcerative colitis is linked to AFFF or PFAS exposure and the claims are then timely to raise now within the statute of limitations.

70. On November 13, 2026, while researching a separate matter against Defendant 3M Company regarding hearing loss caused by defective military earplugs, Plaintiff came across a news story reporting a settlement in litigation over AFFF. Through that news story, Plaintiff

learned for the first time that exposure to AFFF and PFAS-contaminated water has been linked to ulcerative colitis and other serious health conditions, and first understood that his disease and related conditions were caused by Defendants' products.

71. Before November 13, 2026, Plaintiff did not know, nor in the exercise of reasonable diligence could have discovered, that his ulcerative colitis was caused by toxic PFAS exposure from Defendants' AFFF products and contaminated water. Under N.C. Gen. Stat. § 1-52(16), Plaintiff's cause of action accrued on November 13, 2026, and this action, filed on November 16, 2026, is timely within the three-year limitations period of N.C. Gen. Stat. § 1-52.

***Timeliness of Shipboard Claims Under General Maritime Law (46 U.S.C. § 30106)***

72. To the extent Plaintiff's claims arising from shipboard exposure are governed by general maritime law, they are subject to the three-year limitations period of 46 U.S.C. § 30106. Under discovery rules applied to latent injuries in maritime cases, such claims did not arise until Plaintiff knew, or reasonably should have known, of both his injury and cause, which did not occur until November 13, 2026. General maritime law contains no statute of repose.

***Fraudulent Concealment and Equitable Tolling***

73. For decades prior to 2013, Defendants possessed internal toxicological, epidemiological, and bioaccumulation studies proving that PFAS chemicals persist in human serum and cause gastrointestinal and organ toxicity. Defendants intentionally concealed these findings from the military, Plaintiff, and the public, equitably tolling any limitations period.

***Inapplicability of Statute of Repose (N.C. Gen. Stat. § 1-46.1(1))***

74. North Carolina's 12-year product liability statute of repose does not bar action as:

(a) Active-duty tolling under 50 U.S.C. § 3936(a) suspends the repose period through January 30, 2015; and

(b) Under settled North Carolina law (Wilder v. Amatex Corp., 314 N.C. 550 (1985)), statutory repose periods do not apply to latent, disease-based injuries resulting from toxic chemical exposures.

## VI. CAUSES OF ACTION

***Applicable Law***

75. Plaintiff's claims arising from his land-based exposures in North Carolina are governed by North Carolina law. Plaintiff's claims arising from his shipboard exposure aboard USS Kearsarge and USS Iwo Jima on navigable waters are governed by general maritime law, and, to the extent maritime law does not apply or does not supply a rule of decision, by North Carolina law. Counts I through III and V through VII are pleaded under North Carolina law and, as to Plaintiff's shipboard exposure, under general maritime law in the alternative. Count IV is pleaded under general maritime law as to Plaintiff's shipboard exposure only.

## COUNT I — NEGLIGENCE

76. Plaintiff realleges and incorporates paragraphs 1 through 75 as if set forth herein.

77. Defendants owed a duty of reasonable care to foreseeably exposed military personnel, including Plaintiff, to design, test, manufacture, market, and supply AFFF products, mobile spray extinguishers, and fluorosurfactant ingredients that were safe for their intended military uses and would not contaminate water supplies or cause latent autoimmune disease.

78. Defendants breached that duty by formulating AFFF with persistent, bioaccumulative PFAS, failing to conduct health safety testing, failing to provide warnings or protective instructions, and failing to provide containment procedures for leaking extinguishers and discharged foam.

79. As a direct and proximate result of Defendants' negligence, Plaintiff contracted ulcerative colitis, which requires ongoing prescription treatment including prednisone tapers and mesalamine (Lialda), developed non-cancerous liver injury and elevated liver enzymes requiring ongoing monitoring, developed rheumatoid arthritis and asthma with rhinitis, and suffers from permanent physical injury, medical and prescription expenses, severe pain and suffering, embarrassment, loss of enjoyment of life, and permanent disability.

**COUNT II — INADEQUATE WARNING OR INSTRUCTION (N.C. Gen. Stat. § 99B-5)**

80. Plaintiff realleges and incorporates paragraphs 1 through 79 as if set forth herein.

81. Defendants designed, manufactured, and sold AFFF concentrates, mobile spray extinguishers, and fluorosurfactants without adequate warnings or instructions regarding toxic PFAS bioaccumulation, drinking water contamination, or the risk of ulcerative colitis, liver injury, and autoimmune and respiratory disease. No label on Defendants' extinguishers, concentrate containers, or recharge units warned of these dangers.

82. Pursuant to N.C. Gen. Stat. § 99B-5(a), Defendants acted unreasonably in failing to provide adequate warnings. Had adequate warnings been provided, Plaintiff and military safety personnel would have instituted chemical containment, protective gear, and medical monitoring, preventing Plaintiff's injury.

**COUNT III — DEFECTIVE DESIGN OR FORMULATION (N.C. Gen. Stat. § 99B-6)**

83. Plaintiff realleges and incorporates paragraphs 1 through 82 as if set forth herein.

84. Defendants designed and formulated AFFF products using bioaccumulative long-chain PFAS compounds when practical, safer, fluorine-free chemical alternatives were commercially and technically feasible.

85. Pursuant to N.C. Gen. Stat. § 99B-6(a), the foreseeable health risks of Defendants' AFFF formulations far outweighed their utility, rendering the products defectively designed and unreasonably dangerous.

## COUNT IV — STRICT PRODUCTS LIABILITY UNDER GENERAL MARITIME LAW (Shipboard Exposure)

86. Plaintiff realleges and incorporates paragraphs 1 through 85 as if set forth herein.

87. General maritime law recognizes strict liability in tort for injuries caused by defective products. East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858 (1986).

88. Defendants designed, manufactured, sold, and supplied the AFFF concentrates and fluorosurfactants used in the fire suppression systems and firefighting equipment aboard USS Kearsarge and USS Iwo Jima. Those products reached the ships without substantial change in the condition in which Defendants sold them.

89. Defendants' AFFF products were defective and unreasonably dangerous when they left Defendants' control, both in design, because they were formulated with persistent, bioaccumulative, and toxic PFAS when safer alternatives were available, and for lack of adequate warnings, because they carried no warning of their toxic hazards or instructions for protective equipment, safe handling, decontamination, or containment.

90. Plaintiff was a foreseeable user of and bystander to Defendants' AFFF products aboard those vessels, and his exposure occurred during the products' intended and reasonably foreseeable use.

91. As a direct and proximate result of these defects, Plaintiff suffered the injuries and damages described above, and Defendants are strictly liable to him under general maritime law.

## COUNT V — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen. Stat. § 25-2-314)

92. Plaintiff realleges and incorporates paragraphs 1 through 91 as if set forth herein.

93. Defendants were merchants with respect to firefighting foams, mobile extinguishers, and fluorosurfactants, and impliedly warranted under N.C. Gen. Stat. § 25-2-314 that their products were merchantable and fit for ordinary military use.

94. Defendants breached that warranty because their products released toxic PFAS into vehicle interiors, soil, water, and human tissues during ordinary handling. Plaintiff, as an intended end user, is entitled to recover damages under N.C. Gen. Stat. § 99B-2(b).

## COUNT VI — FRAUDULENT CONCEALMENT

95. Plaintiff realleges and incorporates paragraphs 1 through 94 as if set forth herein.

96. Defendants possessed superior, exclusive knowledge regarding internal research proving PFAS toxicity and bioaccumulation, yet intentionally suppressed these material facts to preserve commercial profits.

97. Plaintiff reasonably relied on the apparent safety of military equipment and base water systems, resulting in ulcerative colitis, liver injury, and the other injuries described above.

## COUNT VII — PUNITIVE DAMAGES (N.C. Gen. Stat. § 1D-15 and General Maritime Law)

98. Plaintiff realleges and incorporates paragraphs 1 through 97 as if set forth herein.

99. Defendants' conduct in manufacturing, marketing, and profiting from toxic AFFF products while actively concealing internal toxicity data constitutes fraud, malice, and willful or wanton conduct under N.C. Gen. Stat. § 1D-15, and willful and wanton misconduct under general maritime law, entitling Plaintiff to punitive damages.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff BENJAMIN WAYNE LATHAM respectfully requests that this Court enter judgment against Defendants, jointly and severally, as follows:

(a) Awarding compensatory damages for past and future medical expenses (including ongoing monitoring), prescription medication costs, physical pain and suffering, mental anguish, permanent physical impairment, impairment of earning capacity, and loss of enjoyment of life in an amount exceeding $75,000.01+ to be determined at trial;

(b) Awarding punitive damages pursuant to N.C. Gen. Stat. § 1D-15 and general maritime law to punish and deter;

(c) Awarding pre-judgment and post-judgment interest as allowed by law;

(d) Awarding taxable costs of this action; and

(e) Granting such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable, including his shipboard claims, which he has not designated under Federal Rule of Civil Procedure 9(h).

Respectfully submitted this 16th day of November, 2026.

**BENJAMIN WAYNE LATHAM, Pro Se**
6408 Truxton Lane
Raleigh, NC 27616
BPLATHAM2014@Gmail.com
Phone: (928) 278-7838